## Case No. 10,017.

### The NARRAGANSETT.

[1 Blatchf. 211; 1 Liv. Law Mag. 126.] [1]

Circuit Court, S. D. New York. April Term, 1847.[2]

APPEAL—COLLISION—DAMAGES—SALVAGE SERVICE — DAMAGE IN EFFORTS TO SAVE — LOSS OF SERVICES WHILE UNDERGOING REPAIR.

1. On an appeal in admiralty from the district court, in a case of collision, where the principle on which an allowance has been made by that court is sustained by authority, this court will not interfere with the amount of that allowance, unless it is very strikingly out of proportion to the service or damage.

[Cited in Egbert v. Baltimore & O. R. Co., Case No. 4,305; The Grace Girdler, 7 Wall. (74 U. S.) 204; The Juniata, 93 U. S. 339; The Lord Derby, 17 Fed. 268; The Albany, 48 Fed. 565.]

2. Accordingly, in such a case, though some of the items allowed by the district court appeared large in amount, *held*, that this court would not disturb them.

3. Allowances for salvage service discussed. (Per Betts, District Judge.)

4. Where a vessel is disabled by a collision, damage suffered by her in the course of reasonable and proper efforts to save her, is a consequence of the condition in which she is left by the wrong-doer, and therefore properly chargeable in an action founded on the collision.

5. The value of the services of a vessel while she is undergoing necessary repairs for injuries received by collision, is to be allowed as part of the damage sustained by her owners.

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission. 1 Liv. Law Mag. 126, contains only a partial report.]

[2] [Affirming Case No. 10,020.]

The maritime law is less stringent in this respect than the common law.

[Cited in Munch v. The Sucker State, Case No. 9,921; The Oler, Id. 10,485.]

[Cited in brief in Willey v. Fredericks, 10 Gray, 359.]

[Appeal from the district court of the United States for the Southern district of New York.]

The owners of the sloop Corinthian and the owners of her cargo filed a joint libel in rem, in the district court, against the steamboat Narragansett, to recover damages for a collision. The case was this. On the 3d of January, 1845, the sloop sailed from New-Bedford, Mass., for New-York, with a cargo of sperm and whale oil, sperm candles, whalebone, soap, and spermaceti. She was heavily laden, and had a heavy deck load. About 8 o'clock p. m. on the 8th, while in Long Island Sound, about opposite Black Rock, and midway between the Long Island shore and the Connecticut shore, steering a south-west course, the wind being about west by north, the sloop came into collision with the steamboat. The latter was bound to the eastward. The bowsprit of the sloop was torn from its place, also her rail and bulwarks and windlass, and her bows were broken open, so that she sank in two or three minutes to the water's edge. The captain and mate and the two hands of the sloop got into her boat and remained by her till 5 o'clock a. m., and then rowed to Brookhaven, L. I., where they arrived about 9 a. m. The captain there procured two sloops, the Editor and the Emperor, to assist him. They were laid up in winter quarters, but crews were collected to man them, and about 11 a. m. they started for the Corinthian. When they got to her, about 1 p. m., some sloops and boats were picking up the cargo. Her deck load had been washed overboard, and she was capsized. The two sloops succeeded in righting her, and towed her into Black Rock, where they arrived the same evening about 9 o'clock. They worked till midnight in getting her ashore. Some of the cargo that was picked up was taken to Black Rock, some to Southport, and some to Bridgeport, but part of the deck load was never found. Where the Corinthian lay when the sloops reached her, was about nine miles from Brookhaven, and six miles from Black Rock. The captain of the Corinthian endeavored to make a bargain at Brookhaven with the masters and owners of the two sloops to go to the wreck. They refused to make any specific bargain, saying they could not tell how much their vessels would get damaged, or how much trouble they would have; but said they would go out and assist in getting the sloop in, and charge a fair compensation. The captain of the Corinthian made no offer to them of any distinct compensation. There were five or six men on board of each vessel. It was about seven days from the time of the collision till the Corinthian's cargo was discharged. The masters of the Editor and Em-

peror refused to give up the vessel or cargo, and instituted legal proceedings on their salvage claim, and the property was attached by an officer. The value of the property which the two sloops brought in was between eleven and twelve thousand dollars. The vessel and cargo, including the deck load picked up and brought in by others, were worth about $17,000. Under these circumstances, Mr. Jones, an insurance broker in New-York, who was employed by the underwriters to look after the wreck, allowed the Editor and Emperor $800 in settlement of their salvage claims, with the approval of the master of the Corinthian. Two schooners, the Despatch and the Union, were employed to convey the cargo from Black Rock to New-York, about seventy miles distance. They were paid $60 each, being for four days' services at $15 per day. The Corinthian, after her cargo was discharged, was temporarily repaired at Black Rock, and was then taken to New-Bedford for thorough repair, because the work could be done there better and cheaper. It took a month or more from the time of the collision before the sloop could be got up to the wharf at New-Bedford, so that the crew could be discharged, and it was then some time before she could be got to the ship-yard, because of the ice. She was hauled up for repairs on the 9th of March, and launched on the 2d of June. About half of the time she was under repair was occupied in making repairs that had no connection with the injuries caused by the collision. It was proved that such a vessel as the Corinthian could earn $200 per month, net profits. The capsizing of the Corinthian during the absence of her captain and crew at Brookhaven occurred in this way. The steamboat Eureka came alongside of the sloop, fastened a hawser to her, and attempted to tow her. She steered very well for a few minutes, but the cargo on deck got against her tiller and jammed it hard down, so as to give her a shear, and she capsized. The hawser was then cut, and the Eureka left. The deck load went overboard when the sloop capsized. The Corinthian was fifteen years old at the time of the accident, was in good order, had been thoroughly repaired two years before, had a new hull, a new mast, and new sails, and was of eighty-two tons burthen. It was proved that when new she would cost about $6,000; and that after the collision and before she was repaired, she was worth $1.000 to $1,200, and after she was repaired $3,500 to $4.000.

The district court decreed that the steamboat was in fault on the occasion of the collision, and the sloop without fault; that the libellants were entitled to recover their direct damages caused by the act of the steamboat; that on adjusting the damage in respect to the sloop, she was to be replaced at the expense of the claimants, substantially in the same situation she was in when injured; that the fair and reasonable cost of her necessary reparation was, under ordinary cir-

cumstances, to be referred to as measuring the damages with reasonable certainty; that the same principle applied to the cargo—the parts of it destroyed or lost by the collision to be paid for at their fair value, and the parts saved to be deducted, at their value as saved, less the reasonable and actual expenses of saving, from the amount estimated as a total loss; that no distinction was to be made in respect to the liability of the claimants for those parts of the cargo on deck which were deteriorated or lost by the capsizing of the sloop during the endeavors made by the steamboat Eureka to tow her into port; that the owners of the sloop should recover the amount of injury done to her, including a just proportion of the reasonable and actual salvage expenses and disbursements; and that the owners of the cargo should recover the value of the parts of the cargo owned by them respectively which were lost, and the amount of injury done to the parts saved, including a just proportion of the reasonable and actual expenses and disbursements included in the salvage of the same; and it was referred to a commissioner to ascertain and report the amounts. [Case No. 10,019.]

The commissioner reported that there was to be paid to the owners of the sloop $2,147.-87, and to the owners of the cargo $2,960.01. He allowed $2,029.87 as salvage expenses, to be apportioned among the several owners of the vessel and cargo. On exception to his report by the claimants, the court disallowed $510.05 of the amount reported as salvage expenses, and a further item of $50 in the amount reported as due to the owners of the sloop. But among the items allowed by the court as salvage expenses, notwithstanding the claimants' exception, was the $800 paid to the sloops Editor and Emperor, and the $120 paid to the schooners Despatch and Union. The court also allowed to the owners of the vessel, under the claimants' exception, $500 for the value of the services of the sloop to her owners for two months and a half while she was undergoing repairs. [Case No. 10,020.]

In the district court, Betts, District Judge, in delivering the opinion of the court upon the exceptions taken by the claimants to the commissioner's report, said:

"The first objection touches the allowance of $800 paid the two sloops, the Editor and Emperor, for assisting in raising the Corinthian and towing her into Black Rock harbor. The claimants insist this was no salvage service, and that the amount is exorbitant as a quantum meruit, or compensation on the footing of wages earned. The work turned out to be of no great duration or hazard to the vessels or persons employed; but those particulars do not settle the character of the service and necessarily withdraw it from the class of maritime and salvage claims. Relief to a wrecked vessel does not lose its grade of salvage service, although it may be of the lowest character,

and merit compensation only by measure of daily wages. The Emulous [Case No. 4,480]; Bearse v. 340 Pigs of Copper [Id. 1,193]; The Hector, 3 Hagg. Adm. 90; The Industry, Id. 203; The Clifton, Id. 120. In neither of the five cases cited, was the situation of the salved property so perilous as that of the Corinthian and her cargo, nor were the services rendered greater in extent or in hazard to the salvors.

"In this case, the owners of the two sloops arrested the Corinthian for their compensation, and their claim was adjusted by the master of the Corinthian, with the approval of Mr. Jones, agent of the underwriters, at $800. Those parties thought the compromise advantageous to all concerned in the wreck. Adjustment of salvage claims on the spot, by parties who suppose they are acting for their own interest, though not binding upon third parties, will yet be regarded favorably by maritime courts, as affording, probably, a safer rule of valuation than can be gathered from the ex parte depositions of witnesses. In view of the probable risk of the enterprise, and the value of the property saved, and the promptitude of the service rendered I am not inclined to disturb that adjustment, and am satisfied with the judgment of Mr. Jones that the arrangement was fair and just under the circumstances.

"The next exception is to the allowances to the schooners Union and Despatch. I do not think they should be restricted to mere ordinary freight, but it is reasonable and proper, under the circumstances of their employment, to allow them a compensation of $15 per day, each, for the time occupied in loading, transporting and unloading the cargo.

"The last point in dispute is an allowance of $500 for the value of the services of the vessel, which were lost to her owners while she was undergoing repairs. This particular is necessarily a good deal vague in itself. It is not to be expected that the evidence can fix with exactness the time indispensable for the repair of the injured vessel, or where the work could be most advantageously done, or the value of her services during the period of her disablement. These particulars must rest in a good degree upon estimates. I think the judgment of the witnesses examined on this subject, justifies the conclusion adopted by the commissioner, and I shall allow his report in this behalf to stand."

From the final decree of the district court the claimants appealed to this court.

Francis B. Cutting and Charles B. Moore, for libellants.

J. Prescott Hall and William M. Evarts, for claimants.

NELSON, Circuit Justice. I have examined the several questions presented in this cause, arising out of the damages decreed by the court below, and see no sufficient ground for disturbing the allowances made. Some of

the items appear large, but the principles upon which they have been allowed, seem to be sustained by authority. I cannot interfere with the amount unless it is very strikingly out of proportion to the service or damage.

The additional damage arising out of the upsetting of the Corinthian in the attempt made by the Eureka to tow her into harbor, is perhaps a close question. But the accident does not appear to have occurred from the use of improper means, or from proper means being unskilfully or negligently used. Damage arising from reasonable and proper efforts to save the disabled vessel, is a consequence of the condition in which she is left by the wrong-doer, and is therefore properly chargeable.

The item for the loss of the services of the vessel while undergoing necessary repairs, seems to be a proper allowance, according to the maritime law, which is less stringent in this respect than the common law. The loss of wages is to be taken into account, as part of the damage sustained. Decree affirmed.